## MEINRENKEN v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Appellate Division, First Department. March 11, 1904.)

1. RAILROADS—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—EVIDENCE—
SUFFICIENCY.

In an action against a railroad for the negligent killing of a pedestrian at a crossing, evidence *held* insufficient to show deceased free from contributory negligence.

Hatch, J., dissents.

Appeal from Trial Term, New York County.

Action by Amelia S. Meinrenken, as administratrix of the estate of Gustave D. Meinrenken, deceased, against the New York Central & Hudson River Railroad Company. From a judgment in favor of plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, INGRAHAM, and LAUGHLIN, JJ.

Robert A. Kutschbock, for appellant.

James P. Niemann, for respondent.

INGRAHAM, J.    Upon a former appeal from a judgment in this action in favor of the plaintiff (81 App. Div. 132, 80 N. Y. Supp. 1074), the judgment was reversed and a new trial ordered. Upon the new trial the plaintiff again obtained a verdict, from which the defendant appeals.

The locality, the nature of the accident, and the testimony to sustain the plaintiff's action are detailed in the opinion upon the former appeal. It was there held that the verdict was against the weight of evidence, both as to the negligence of the defendant and the contributory negligence of the plaintiff's intestate.

The tracks of the Hudson River Railroad are located between 12th avenue and the river. Twelfth avenue does not here appear to be graded, curbed, or paved above 134th street, nor had 134th street been laid out west of 12th avenue. There was, however, a paved roadway about 30 feet in width that crossed the railroad tracks, and furnished access to the river from 12th avenue, which had been in use for two or three years prior to the accident. The two center tracks of the defendant are used for passing trains, while the east and west tracks were used for the storage of freight cars. On the west of the tracks there was a roadway extending north from 134th street, about 60 feet in width. Eight or 10 feet of this roadway was paved, and it was used by wagons and pedestrians in going to a dock at the foot of 135th street. There was a garbage dump at the foot of 134th street, and this paved roadway seems to have been principally used to furnish access to the garbage dock, and to remove freight from freight cars standing on the side track. There was no flagman stationed at

134th street, the man stationed there during the day leaving at 6 o'clock; and there were no gates at the crossing at 134th street, and no electric bells. About 9 o'clock on the night of July 20, 1901, a freight train was going north upon the easterly of the middle tracks, and a passenger train was going south on the westerly of the middle tracks; the engine of the passenger train passing the caboose of the freight train at 131st street. There was a clubhouse south of 138th street, on the Hudson river, west of the defendant's tracks. Upon the night of July 20, 1901, one Connett and plaintiff's intestate, who were members of the club, left the clubhouse shortly before 9 o'clock, and walked down towards 134th street. Though it was a dark night, they were visible for 50 feet after leaving this clubhouse. After they left the clubhouse, the passenger train going south passed. It was going fast, and the freight train was then passing it going north. This passenger train was a regular train, known as the "Dolly," passing the fishing house about 3 minutes before 9 o'clock. There were freight cars standing on both the east and west side tracks on the night in question, and upon the west track they extended up to within 4 or 5 feet of 134th street. The passenger train had at least five cars that were lighted, and it could be seen without difficulty as it approached. The headlight was lighted, but the glass had apparently become smoky or dim. This approaching train was visible 200 feet above the clubhouse, and there was sufficient light to distinguish a man 300 feet away. People, in going to and from this clubhouse, were in the habit of either walking upon the path to the west of the tracks, or upon the railroad tracks. Smith, a witness who was examined for the plaintiff, testified that he was walking up the track towards 134th street; that he arrived at 134th street at half past 8 or a quarter to 9 o'clock; that he then saw a very long freight train going north; that he stood at the southerly side of the 134th street crossing, waiting for the freight train to pass; that the engine of the freight train was "pumping pretty hard, and there was rattling of the bumpers"; that as he stood there he looked up the track, and saw another train coming; that he then saw two men coming up behind the standing freight car, and that they got over on the crossing; that these men looked up the south-bound track; that the witness looked before they did; that when he looked at the two men he did not see anything coming, or hear any whistle or bell ringing; that, the first thing he knew, he felt the suction of the wind; he saw it was the Dolly right on top of him, and he grabbed the bumper of the freight with his right hand—the rail that is on the side of the step; the moving freight was going up, and the Dolly was coming down; that he stood on the freight car until the Dolly went by, and he got off, halfway between 134th and 135th streets, and walked back to the crossing again, and came across a dead body lying near the crossing. On cross-examination he said he stood on the south side of the 134th street crossing, between the north-bound and south-bound tracks; that up to the time he felt the suction of air he had been looking at the freight train all the while, but he looked up the track three or four times and did not see anything; that he saw these two men look up the track, and he looked up also; that he saw the men before they got to the crossing; that they were coming on the crossing when he first saw them; that he saw them

standing on the south side of the crossing, between the side track and the south-bound track; that the last time he saw them they were standing there; that it was so dark he could not distinctly see the position they occupied; that they were five or six feet away, but it was so dark he could not tell how near they were standing to each other, but he could see by one of their heads which way they were looking; that the head of one of them was turned towards 138th street; he did not know which one was looking that way; that as the freight train went by there was a good deal of smoke coming from the engine; that he could see the cars going by, because he was near enough to see them, but in other respects he could not see, it was so dark and dense.

From this evidence, is it possible to find that the dead man whose body was found five or more feet north of the crossing was the man seen upon the crossing, or that he was free from contributory negligence? It is quite evident that it would be a physical impossibility for the body of a man who was struck by a south-bound car on the crossing to be afterwards found north of the crossing. If he was struck down where he stood, he must have been standing where his body was found; and, while it is quite probable that the body would be carried along with the train, it is inconceivable that it would have been thrown by the train back in the direction from which the train was coming. The deceased and his companion were familiar with the locality, and with the fact that this passenger train passed at about this time. People from this clubhouse were in the habit of walking down the tracks, or on the road west of the track. The standing freight cars were five feet or less from the crossing, and a person, to get on the track five feet or more north of the crossing, would necessarily have had to walk around the freight car, and then to the north. It is much more probable, considering the location of the freight car and the place in which the body of the plaintiff's intestate was found, that he was walking down the track when struck by the passing train; but, assuming that the two men were the ones that the witness Smith saw, and that, notwithstanding the contradictions in his testimony, he did see two men standing on the crossing west of the south-bound track shortly before the train came, they were then in a position of safety, waiting for the freight train upon the north-bound track to cross. To account for the accident, assuming Smith's story to be true, they must have stepped on the track directly in front of the approaching train and walked north on the track. The passenger train could be seen for 200 feet, as testified to by a witness for the plaintiff who saw the train approaching at the clubhouse. It may be that the approaching passenger train was at 134th street somewhat obscured by the smoke of the freight engine, but certainly these men were not justified in stepping in front of the train, and walking north on the track in front of the approaching train, instead of remaining in a place of safety, off the track, until the freight train had passed.

Upon the former appeal we thought that a verdict that the deceased was free from contributory negligence was clearly against the weight of evidence, and I cannot see that this evidence has at all changed the facts upon which that conclusion was reached. We have the same situation and the same conditions. There is nothing to explain how

it was possible for either of the men that were killed to have been thrown by a south-bound train a distance to the north of the position at which it is said they were seen just before they were struck; and, to sustain this verdict, the jury must have been justified in finding that these two men, standing or. waiting on this railroad track, with a passenger train about due, were relieved from the imputation of negligence. I can find no evidence that would justify such a finding, and, considering the undisputed fact as to the position of the body of the plaintiff's intestate, it is apparent that he was upon the track off the crossing when struck, and under conditions which negative the finding that he exercised any care in assuming the position that he did upon this track. We can see no escape from the conclusion that the plaintiff failed to show that the deceased was free from contributory negligence.

It follows that the judgment and order appealed from is reversed, and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and LAUGHLIN, J., concur. HATCH, J., dissents.